## Case No. 1,621.

### BOND v. The CORA.

[2 Wash. C. C. 80; 2 Pet. Adm. 373.][1]

Circuit Court, D. Pennsylvania. April Term, 1807.[2]

SALVAGE—RISK—AMOUNT OF AWARD—COMPENSATION TO FREIGHTER—TO PASSENGER—DISTRIBUTION AMONG SALVORS — MARITIME LAW—DEVIATION.

1. Salvage should always comprehend a reward for the risk of life and property, labour and danger in the undertaking, and should be so liberal as to afford a sufficient inducement to similar exertions to preserve the life and property of others.

2. The only rule for the amount of salvage, is that which is dictated by a sound discretion, under the particular circumstances of the case.

[Cited in Sewell v. Nine Bales of Cotton, Case No. 12,683; Sinclair v. Cooper, 108 U. S. 358, 2 Sup. Ct. 758.]

3. Unless in cases of very extraordinary merit, or where the property saved is very large or very small, one-third has been the most usual rate.

4. What will constitute a deviation on a voyage insured. To go out of her course to save the life of a man, will not be considered a deviation. [But stoppage to save property is deviation, and discharges the insurer.]

[Cited in The Waterloo, Case No. 17,257; The Henry Ewbank, Id. 6,376; The Nathaniel Hooper, Id. 10,032; Peterson v. The Chandos, 4 Fed. 653.]

[See The Boston, Case No. 1,673; The George Nicholaus, Id. 13,578; Crocker v. Jackson, Id. 3,398.]

5. The owner of the vessel, and not the freighter, is entitled to salvage, unless being on board at the time the property was saved, he consented to the same, and thus discharged the

[1] [Originally published from the MSS. of Hon. Bushrod Washington, Associate Justice of the Supreme Court of the United States, under the supervision of Richard Peters, Jr., Esq. Also reported by Hon. Richard Peters, District Judge, and here compiled and reprinted. Bracketed matter from 2 Pet. Adm. 373.]

[2] [Affirming Bond v. The Cora, Case No. 1,620.]

owner of the vessel from the responsibility incurred by deviating to save property.

[Cited in The Nathaniel Hooper, Case No. 10,-032; The Dupuy De Lome, 55 Fed. 97.]

[See Williams v. The Adolphe, Case No. 17,-712; The Persian Monarch, 23 Fed. 820.]

6. A passenger who assisted in saving the property, is entitled to a portion of the salvage.

[See The Charles Henry, Case No. 2,617; The Anastasia, Id. 346; The Pennsylvania, Id. 10,945; The Connemara, 108 U. S. 352, 2 Sup. Ct. 754.]

7. Distribution of the salvage among the persons entitled to it. The portions of salvage ought not to be so much regarded as the actual sum to be paid to the salvors.

[Cited in Tyson v. Prior, Case No. 14,319; Smith v. The Joseph Stewart, Id. 13,070; Sewell v. Nine Bales of Cotton, Id. 12,683; The John Wurts, Id. 7,434; Waterbury v. Myrick, Id. 17,253; The Pomona, 37 Fed. 816.]

[Appeal from the district court of the United States for the district of Pennsylvania.

[In admiralty. Libel by Phineas Bond, Esq., his Britannic majesty's consul general for the middle and southern states, against the British brig Cora, praying a restoration of said brig to her owners; also libels against the said brig for salvage by Nathaniel L. Griswold and George Griswold, owners of the brig Ceres, Bartlet Shepherd, master, and others, seamen of the Ceres, and by Don Juan de Echevirria (Echeverria), passenger on the Ceres, and by Daniel Ludlow and others, shippers of cargo on board the Ceres. The district court ordered a sale of the Cora, and decreed that salvage be paid out of the proceeds, except to Ludlow and his colibelants, and that the residue be restored to the owners. Bond v. The Cora, Case No. 1,620. The owners, master, and crew of the Ceres, also Ludlow and his colibelants, and the British consul, appeal. Affirmed.]

[3] From this decree [in Bond v. The Cora, Case No. 1,620] an appeal was entered to the circuit court of the United States, and the case was fully argued before the Honorable Judge WASHINGTON. The claims of the freighters to salvage were opposed on the principles urged in the district court. Ingersoll and Duponceau for the freighters, Rawle and Peters, Jun., for the owners of the Ceres.

[The claim of Echeverria, the Spanish passenger, was opposed on the testimony of one of the witnesses, who stated he had not given aid to the Ceres when in time of difficulty and danger. The right of passengers to salvage, who assist in saving property found at sea, was not denied.

[Mr. Tilghman, for the British consul, opposed the decree of the district court allowing one-third of the net proceeds of the Cora and cargo as salvage. A greater allowance was claimed by Rawle and Peters, Jun., for the master, owners, and crew of the Ceres. Judge Washington gave the following opinion:][3]

---

[3] [From 2 Pet. Adm. 372, 373.]

The statement of the case will be found in the opinion delivered by WASHINGTON, Circuit Justice. This is an appeal from the district court of Pennsylvania, in a case of salvage. The case appears to be, that the brig Ceres, on her return voyage from Havana to New-York, laden with a cargo, partly on freight and partly belonging to the owners, Nathaniel Griswold and George Griswold, commanded by captain [Bartlet][4] Shepherd, and with a crew consisting of the mate, four seamen, and the cook, and having on board one passenger; on the 26th of August fell in with the brig Cora, an English vessel, in latitude 32° north, and longitude 74° 30' west from London. The captain having hailed the Cora, and received no answer, he boarded her, and found her laden with a valuable cargo, but wholly deserted. He put on board the Cora, the mate of the Ceres [Dennison Wood],[5] with [Andrew][5] Eddy and Farris [Thomas Ferris],[5] two of the seamen, with orders to keep company with the Ceres; and, to enable her to do so, the captain slackened sail on board the Ceres. On the 28th of the same month, the Cora was taken in tow by the Ceres, but they were soon again separated by the breaking of the hawser. The two vessels, however, kept company until the 3d of September, when a violent gale arose and parted them; but not until the captain had given orders to the mate to make for the nearest port in the United States. It appears that it was with great difficulty the Ceres could be navigated, in consequence of the diminution of the crew; and that she was exposed on that account to considerable danger and loss of rigging.

The Cora, when she was boarded, had five feet of water in her hold. The mate and his two men were employed from the night of the 26th to the 28th, in pumping her out. It appears that they encountered many difficulties, and were exposed to much danger, during the storm which separated the Cora from the Ceres. When that subsided, they bore away for the nearest port; took in a pilot on the 7th, and anchored within the Delaware bay on the 8th of September. The Ceres came to anchor on the 11th, off Sandy Hook.

Libels for salvage were filed in the district court by the owners of the Ceres, by the freighters, the captain and crew, and by Mr. Echeverria, a Spanish passenger. The district court having decreed one-third[6] of the

---

[4] [From 2 Pet. Adm. 373.]

[5] [From 2 Pet. Adm. 374.]

[6] [From 2 Wash. C. C. 81:] The district court proceeded no farther than to decree the rate of salvage, and the appeal was prayed and entered by consent, for the sake of expedition, and to try the principles of salvage. After I had made my decree, I found, upon conference with the judge of that court, that we entirely concurred upon every point; in consequence of which, his decree was made so as to conform to that of this court.

gross amount of the sales of the cargo for salvage, cross-appeals were entered.

The first question to be decided, is the rate of salvage which ought to be allowed to the salvors. I adopt the expressions, as I do the sentiments of the district judge, in the Case of La Belle Creole [Case No. 17,165], "the salvage should comprehend a reward for the risk of life and property, labour and danger, in the undertaking; and should be so liberal, as to afford a sufficient inducement to similar exertions to preserve the lives and property of others."

In appreciating and properly rewarding such services, no rule but that which a sound discretion may suggest, upon a view of all the circumstances of each particular case, can be laid down; and yet, men possessing equal liberality and minds equally intelligent, would vary very consideably from each other in fixing the quantum of this reward. But, although no certain rule can be established to govern every possible case, yet it is proper to refer to former decisions in cases not very dissimilar from that under consideration, from which principles may be extracted, which may and ought to be regarded. In searching for something like a general rule, through the numerous cases which have been decided on this point, it appears, that in those of very great or very small merit [that except in cases of very great or very small hazard],[7] or where the property saved has been to the property at risk, in a ratio very much beyond, or very far short of a fair compensation for the service rendered, and the risk incurred, the salvage allowed is about the proportion decreed in this case. It is unnecessary to go through all the cases upon this subject, because I think that of The Blaireau, 2 Cranch [6 U. S.] 240, which is the first authority in this court, does, in all its circumstances, as nearly resemble the present as any I have met with.

In that case, one mariner was found on board The Blaireau; and in this, the vessel was totally deserted. This difference, it is contended, renders the former a case of much less merit than the present. But this difference does not strike me to be otherwise material than as the navigation of the two vessels in the former case was rendered in a small degree less laborious, and perhaps somewhat less dangerous, by the addition of Tool, the man found on board The Blaireau. The Cora, it is true, was deserted, but she was not abandoned. This, in substance, was the case with The Blaireau; as it is clear that Tool's remaining on board that vessel was not a voluntary act, but merely accidental. The Blaireau had a navigation of nearly 3,000 miles to accomplish, before she could reach a port of safety. The Cora had scarcely half as far to go, but I believe it to be a fact, that the danger is greater when the vessel approaches the American coast; and besides, it does not appear that the former [the Fame and][8] The Blaireau, experienced any severe weather; whereas the Ceres and Cora were both exposed to the fury of a violent storm. The former, The Blaireau, was an indifferent vessel, was considerably injured, and required pumping frequently to keep her free; The Cora was perfectly strong and well constructed. In these respects, the merits of the salvors in the former, exceeded those of the salvors in the latter case. On the other hand, the former [the Fame][8] retained on board more than two hands; and it did not appear that the seven hands left with The Blaireau, were insufficient to navigate her with safety. Comparing these two cases together, I cannot think of increasing the salvage allowed by the district court; and, on the other hand, considering the risk to which both the Ceres and Cora were exposed, in consequence of the insufficient number of hands by which they were respectively navigated, and recollecting no case of equal merit with the present, where less than one-third has been allowed; I do not feel disposed to diminish this proportion.

The next consideration is, how ought this salvage to be distributed? The rights of the owners of the vessel and freight, and of the master and crew, are not questioned. But these persons contest the claims of the freighter and of the passenger. First, as to the freighter. Salvage being intended as a reward for meritorious services performed; and to encourage others to similar exertions, whenever the occasion may occur, it follows, that all those who risk their property are entitled to participate in the reward. It is contended by the freighter, that the acts done by the captain of the Ceres, amounted to a deviation, which discharged the underwriters, in case the cargo was insured; and increased the risk of safe arrival, if the freighter stood his own insurer. This proposition presents two questions—first, was there a deviation? and, secondly, if there was, on whom would the loss have fallen, had the Ceres not arrived? First, the general definition of deviation is, a voluntary departure from the course of the voyage insured, without necessity or reasonable cause; and I recollect no case, where the justification is not essentially connected with the motive of safety to the property insured. If the object of the deviation be to save the life of a man, I will not be the first judge to exclude such a case from the exceptions to the general rule. The humanity of the motive, and the morality of the act, give it a strong claim to indulgence; but after this object is effected, if the stoppage be continued, or the risk increased, by adding to the cargo, diminishing the crew, or by other means, for the purpose of saving the property found, I think the underwriters are discharged. For

[7] [From 2 Pet. Adm. 375.]                    [8] [From 2 Pet. Adm. 371.]

let me ask, if salvage be allowed to the owner in consideration of the risk to which his property is exposed, where is the risk if he be insured? and if the act which produces the increased risk, do not discharge the underwriters, upon what fair principle shall they take all the risk, and the insured receive all the reward?

It is said to be for the general benefit of underwriters, to permit the insured to save property found at sea, without considering the act as a deviation. But I suspect that underwriters are too well acquainted with their interest, to yield a ready assent to this proposition. The underwriters on the saving vessel would take upon themselves an increased risk, without receiving an increased reward; and the insurers on the property saved, could feel no inducement to grant encouragement to those who have the power to save it—since a liberal salvage will never fail to stimulate their exertions. The former can never derive a benefit from an act which increases their risk, and the latter can feel no motive for consenting to encounter · a similar danger, when, in turn, they may be insurers of the saving vessel.

If then an act similar to that performed by the Ceres, amount to a deviation, what, in the second place, is the risk to which the property of the freighter is exposed? Whether he be insured or not, the owner of the vessel is responsible to him, if a loss happen in consequence of the deviation. If so, then it is the owner, of the vessel, and· not the freighter, who risks the value of the cargo, as well as that of the vessel and freight. But it is contended that the owner may be worth nothing, in which case the freighter would lose the effect of his recourse against the owner. To this, there are two answers; first, the owner of the vessel is trusted by the freighter at all events, and he is consequently deemed sufficient to answer for every unlawful act of the master: and, secondly, the argument can never apply, but in a case where the court, who is distributing the salvage, is satisfied of the fact that the insolvency of the owner really exists. I will not say that if such a case were made out, the court might not, upon principles of equity, decree to the freighter what, otherwise, the owner would have been entitled to.

Thus the question seems to stand in point of principle. As to authorities, it is admitted that no instance can be found of salvage being allowed to the freighter in a case resembling the present. In the case of The Mary Ford, 3 Dall. [3 U. S.] 188, though the George had a valuable cargo on board on freight, yet the whole salvage was given to the owner of the vessel, and the crew. In the case of The Jefferson, decided in the district court of New York [Morehouse v. The Jefferson, Case No. 9,793], the owners of the vessel were also owners of part of the cargo, and the master was owner of the residue. They were very properly allowed salvage in

consideration of their respective interests in the cargo, because the risk of deviation fell upon them.

It is unreasonable to suppose, that in the multitude of cases which were cited at the bar, some of the saving vessels should not have had cargoes on freight; and yet in not one, except that of The Blaireau, does it appear that even the claim of a freighter was interposed. This is certainly strong evidence of the general understanding of legal .and commercial men, as to the rights of such a claimant.

I now come to the cause of The Blaireau [2 Cranch (6 U. S.) 240], in which the freighter was allowed salvage in proportion to the value of his property on board. The supreme court considered the cargo as being at his risk, in consequence of the consent of Christie, one of the joint owners of it, to those acts which tended to increase the risk. But the right of a ship owner to freight, arising out of an express contract, it was not considered that a permission to stop for the relief of the Blaireau, which was as well for the benefit of the owner and crew as of the freighter, could, by implication, release the owner from his obligation to carry the cargo safely before he could claim his freight. No doubt. that the court considered the acts of Christie binding upon Jackson; but these acts were not such as operated to vary the contract respecting the freight, though it was construed to go so far as to charge Christie and Jackson with the hazards to be encountered by the cargo.

It appears to me, that the case of The Blaireau applies strongly to the present. It clearly supports the following principles; first, that by acts similar to those done in this, the insurance on the vessel and cargo [freight] [*] was vacated; second, that the freighter is indemnified by the owner, in case of loss arising from such acts of the master, and consequently is not entitled to salvage, [except] [9] where he does some act which discharges the owner from his responsibility.

The only remaining question respects the claim of Don Juan Echeverria, a passenger on board the Ceres at the time the Cora was found. The facts respecting him, which seem not to be disputed, are; that being at Havana, he took his passage on board the Ceres for New York, for which he was to pay forty dollars; that he had been accustomed to the navigation of vessels, and had commanded them in the merchant service of Spain; that he assisted in the navigation of the Ceres, before and after the Cora was found, whenever the weather was fair. The captain's declarations, if they can be received in evidence, attest his merit and usefulness on all occasions during the voyage, though it is sworn by one witness, that this claimant would afford no assistance in tempestuous weather. Without taking into con-

---

[9] [From 2 Pet. Adm. 380.]

sideration these declarations of the captain, which have been objected to, but without deciding in favour, or against the propriety of admitting such evidence in a court of admiralty in a case precisely like the present,[10] I am satisfied that the claimant is entitled to the share of a common seaman, in which capacity it is admitted that he acted in the navigation of the Ceres. It is too much to expect that I can credit what is said by the witness, who testifies as to his general conduct, that at a time of danger, which was rendered imminent by the scarcity of hands on board, a skilful navigator, whose life, in common with every person on board was in hazard; would, at such a time above all others, withdraw, or would have been permitted to withdraw, from the common exertions to preserve the vessel and the lives of the crew.

In making a distribution of the salvage, I shall follow the rule which seems to have governed the supreme court in the case of The Blaireau, so far as it applies. I shall therefore allow the owner of the vessel one-third part of the salvage decreed, and divide the residue into twenty-four parts, whereof six shall go to the captain, four to the mate, and three to the two seamen who assisted him in navigating the Cora; and whose danger and labour greatly exceeded that of the crew on board the Ceres; two shares to each of the mariners, including the cook, on board the Ceres, and the same proportion to Echeverria, the passenger.

It is true, that although the owner will receive in this case the same proportion as was allotted to the owner and freighter in the case of The Blaireau, yet it will not bear the same proportion to the property at risk. But I think, with the judge of this district, as reported in one of the cases which were cited, that the proportions ought not to be so much regarded, as the actual sum to be paid by the salvors.

If the property saved be considerable, the proportion will of course increase the reward, both as it respects the property at risk, and the principal danger and labour of the salvors. If it be small, this reward will be diminished; and so it ought to be, because, upon the principles of equality, in which consists the highest equity, a reasonable part or the thing saved should remain to the original owner of the whole. But where the usual rate of salvage, taken from the property saved, would afford a very inadequate reward

to the owners of the property at risk, or to the salvors for their personal danger and labour; that might afford a good reason for increasing the rate of salvage, with a view to rendering the compensation adequate, without, at the same time, losing sight of the interest of the owners of the property saved. Taking all these circumstances into consideration, I am satisfied, that though the sum allowed to the owners, in this instance, is less in proportion to the property they had at risk, than was allowed to the owners in the case of The Blaireau, still it is sufficiently ample and liberal.

Decree affirmed.

---

[10] [From 2 Pet. Adm. 281:] The evidence offered was, the declarations of the captain relative to the conduct of the passenger. These declarations were proved by persons who had lodged with the captain after his arrival in New York. The admission of this testimony, was opposed on the principle that as the allowance to the passenger would be taken from the sum which would be distributed among the crew of the Ceres, and would not affect the amount to be given to the captain, it would be introducing as evidence the declarations of a stranger who was not on oath when they were made.

