## THE SVEALAND.

(Circuit Court of Appeals, Fourth Circuit. February 21, 1905.)

No. 575.

1. ADMIRALTY—REVIEW ON APPEAL—FINDINGS OF FACT.

A decree in admiralty, based on facts found by the court from conflicting testimony of witnesses, the most of whom were examined before the court, will not be disturbed on appeal unless clearly unsupported by the evidence.

2. SEAMEN—INJURY IN SERVICE—LIABILITY OF SHIP FOR FAILURE TO FURNISH PROPER TREATMENT.

The master of a steamship held not negligent for not deviating from his course during a voyage to a port to procure medical treatment for a seaman who had broken his ankle, where the end of the voyage near New York was reached within 48 hours after the injury; but the ship held liable for his failure to procure proper treatment and attention for the seaman after reaching port, it having been 10 days, and after starting on a new voyage, before he was taken off the vessel and placed in competent hands, the result being that the injury was greatly aggravated by the delay.

Appeal from the District Court of the United States for the Eastern District of Virginia, in Admiralty.

For opinion below, see 132 Fed. 932.

H. H. Little, for appellant.

W. B. Barton, for appellee.

Before GOFF and PRITCHARD, Circuit Judges.

GOFF, Circuit Judge. This appeal is prosecuted from a decree of the court below allowing damages to the appellee because of the neglect of the master of the steamship Svealand to furnish him proper medical aid and treatment after he had been injured on said vessel when in the discharge of his duties as a seaman thereon. The appellant insists that the court below erred in holding the vessel liable under the circumstances, existing at and immediately after the accident to appellee, set forth in the testimony taken at the hearing of this cause. The case is clearly stated in the opinion filed by the judge who heard it, and before whom most of the witnesses were orally examined.

There is no serious contention as to the law applicable to the facts existing at the time the appellee was injured. It is not claimed that the vessel is liable to the appellee for the injury he sustained, but the insistence is made that, because of the failure of the master to provide competent medical attention at the earliest possible time after the accident, the vessel is responsible for such neglect, and for the injury and suffering caused thereby. With the propositions of law announced by the court below, we are in full accord. The decree is based on the facts found by the court from the conflicting testimony as to the conduct of the master in providing medical attention, with hospital care and comforts. Clearly the evidence offered by the appellee sustains the conclusion reached by the court below. It is quite as clear that the court did not give full weight to the, at least, unsatisfactory testimony submitted by the master. Under such circumstances this court will not reverse a decree based on such findings, unless clearly against the evidence. Whitney v. Olsen, 108 Fed. 292, 47 C. C. A. 331, and cases there cited.

We include in this opinion, as part thereof, the views of the court below, as follows:

"The libelant, a seaman on board the Swedish steamship Svealand, en route from Tampico, Mexico, to New York, by way of Perth Amboy, N. J., on the return voyage to New York, from whence he had shipped to Tampico and return, on the 14th day of December, 1903, while on the high seas, in the vicinity of Cape Hatteras, in descending a ladder into the hold of the ship lost his footing, and fell a distance of some 20 feet, fracturing his ankle. The libel is filed to recover damages against the steamship because of its failure to put into the port of Norfolk, where the libelant could have received prompt medical and surgical treatment, but instead proceeded on its journey to New York; also for the failure to afford the libelant prompt and proper surgical treatment, and for the additional pain and permanent character of the injury caused by such delay.

"The duty of the master to furnish the libelant with proper and prompt medical treatment and surgical aid, on account of an injury sustained by him while in the service of the ship, may be conceded, but whether the ship should be held liable for the failure to divert its course and put into Norfolk depends upon the facts and circumstances of this particular case. The conclusion reached by the court is that the ship was not at fault, under the circumstances in which the master was placed, in this respect. The time to be saved by so doing, and the extent of the injury to the libelant, as the same then appeared, was not sufficient to justify the vessel making a deviation from its route. This particular subject has been so recently under review by the Circuit Court of Appeals for the Ninth Circuit, in the cases of The Troop (D. C.) 118 Fed. 769, and The Iroquois, 118 Fed. 1003, 55 C. C. A. 497 (the latter also by the Supreme Court of the United States, 194 U. S. 240, 24 Sup. Ct. 640, 48 L. Ed. 955, to which latter opinion by Mr. Justice Brown, with the authorities there cited, special reference is made, as containing a comprehensive and complete discussion thereof), as to render further elaboration unnecessary.

"The inability of the libelant to recover for the injury he sustained by reason of the fall is conceded by his counsel. Indeed, such claim is not asserted. And the freedom of the ship from liability to its seamen for injury received in the discharge of their duties, except in cases arising by reason of the unseaworthiness of the ship, or a failure to supply and keep in order the proper appliances appurtenant to the ship, is recognized. The Osceola, 189 U. S. 158, 175, 23 Sup. Ct. 483, 47 L. Ed. 760. But the libelant bases his claim upon his right to recover damages for the failure of the ship to afford prompt and efficient medical and surgical aid after he sustained his injury. That such last-named liability exists, if in point of fact there was neglect on the

part of the ship, seems equally well settled. In the Iroquois Case, supra, the Supreme Court of the United States affirmed a judgment of the lower court for $6,000, awarded the libelant for the failure of the ship to deviate from its course and put into a nearer port, where the libelant could have received medical treatment more promptly. It would follow that if there was a failure to furnish medical treatment at the end of the voyage, in a case like the one under consideration, where the circumstances did not necessarily require a departure from the course, that likewise a recovery should be had for such neglect, as it is for precisely the same thing in a more aggravated form. The master would be more readily excused for a failure to deviate from his course, and go hundreds of miles out of his way, involving the loss of time and expenses necessarily incident to such a change. But the imposition upon the master to give proper and prompt attention to a crippled seaman on reaching the port of destination is a very different thing. The neglect in the latter case, having in view the humanities of the situation, seems almost inexcusable. Here the libelant sustained his injury, the horrible breaking of his ankle joint, which has crippled him for life, and on account of which he suffered greatly, and from which he was required to stay in a hospital from the 24th of December, 1903, certainly as late as the middle of June, 1904, without walking, except on crutches. He was injured at sea on the early morning of the 14th of December, and reached the port of Perth Amboy 48 hours afterwards. He remained at Perth Amboy two days, leaving there on the 18th, and reached Norfolk on the 20th. The master of the ship, it seems, visited him twice after his injury, and once at Perth Amboy, where he called in a doctor, who saw the libelant only once, and considered the injury to his ankle a sprain, and instead of the libelant, who was then at the end of his voyage, and entitled to be released and discharged, being sent to the hospital for medical treatment, all of which he insists he asked should be done, he was brought back to Norfolk on another voyage, where he arrived two days later, when another doctor was called in, who saw the libelant daily on the ship for three or four days, and who likewise practiced upon his limb for sprain, until the libelant insisted upon calling in another physician, who discovered his serious condition, and promptly sent him to the hospital, where, 10 days after the receipt of his injury, he was afforded proper medical treatment. During all of this time this seaman was confined to his bunk in the ship's forecastle, an unsuitable and uncomfortable place, the bunk being, it is claimed, too short, and in which he suffered greatly. Dr. Graves, the physician having charge of the libelant at the hospital, described his injury, and what had to be done for it, as follows:

"'I examined his ankle and found it in a little disturbed condition—twisted; and I made a diagnosis of fracture of the larger bones, and considerable tearing of the ligament; that is, the tissues that bind the bones together, and especially on the outer side, which allowed the foot to tilt freely. I chloroformed him, and broke up the union which had taken place in the bone, and the bone was somewhat impacted—broke; that is, when broken in two, the shock had dovetailed it, and under the anæsthetic the bone was carried out again; that is, the break was renewed, and the ankle put straight, and put in place. After taking it out of plaster, the foot on the inner side was straight, but on the outer side it remained very prominent—the outer bone pushed forward and outward of the foot; had the appearance below the joint of still tilting in. A second examination showed something interposing between these bones, and that necessitated opening the joint, and the interposition there was a dislocation of one of the smaller bones, and caused the ankle to go in. After that was removed, the bone was carried straight, and the foot comes down level. But the ankle is permanently disabled; he will have a useful foot, and be able to carry on good work on that foot; but whether he will be able to climb ladders as he did before, and stand on that foot, where heavy weights are necessary, and pulling, I cannot say but that he may feel some giving away in the ankle.'

"It will be seen from this statement that during the time that elapsed before proper medical treatment was afforded the libelant, which was readily at hand both in New York and Norfolk, a union had taken place in the bone, and that the first thing necessary to be done was to administer chloroform,

and break up the union thus formed; that is, to renew the break, and put the ankle straight; and so serious was the character of the injury, and the condition of the then limb in which it was found, that subsequently it had to be broken over again. This doctor further testified as to the painful character of the injury by reason of its location.

"Respondent seeks immunity from liability to the libelant because of calling in the doctors at Perth Amboy and Norfolk, and also to excuse itself for bringing libelant away from New York, instead of sending him to the hospital there, because, it claimed, the libelant did not ask to be either formally discharged or sent to the hospital. This will not do, even assuming the facts to be as contended for by the respondent, with which the court does not agree. No formal discharge of the libelant was necessary; his voyage had ended. Nor was it necessary for him to demand to be sent to a hospital. The duty imposed upon the ship was an affirmative one; that is, to care properly for a crippled seaman, and see that he was afforded prompt and proper medical and surgical treatment; and he should have been sent to the hospital in his then condition, and under no circumstances should the ship have put back to sea with a seaman, at the end of his voyage, in the crippled condition in which he was. Once countenance this conduct, and the custom would soon prevail for the substitution of the inexperienced officer of the ship, acting as doctor, in unsuitable quarters on shipboard, for the intelligent care and comfortable provision of crippled seamen at the hospitals of the country. In The Iroquois, 194 U. S. 240, 24 Sup. Ct. 640, 48 L. Ed. 955, supra, much the same contention was made as is here set up; that is to say, the defense was that the libelant made no complaint that the bones of his limb had not united, or of the failure of the master to turn about and put into a nearby port for medical treatment. But the court, speaking through Mr. Justice Brown, in discussing the first question said: 'Yet with a careful examination, such as the master was bound to make, we think he should have detected it;' and in reference to the latter: 'We lay no stress on the fact that the libelant did not ask to be taken into an intermediate port. He was a boy, largely ignorant of his rights and duties. The master was his legal guardian, in the sense that it is a part of his duty to look out for the safety and care of his seamen, whether they make a distinct request for it or not. If, on arriving at Valparaiso, the bones were found not to have knitted together, there was at least a chance of securing their union by proper treatment. If, upon the other hand, they had united, there was a certainty of securing ultimate recovery by careful nursing, and by the use of facilities which the hospital undoubtedly would have, and which the ship had not. To put it in a light most favorable to the master, he speculated upon the chance that a union of the bones had taken place, without seeking to inform himself of the fact.' And in this same case the Supreme Court criticised the action of the ship's master in allowing a crippled seaman to remain in the forecastle of the ship, instead of placing him in the cabin, where he could have been more comfortably provided for. In that case, it is true, the injury was of a more serious character than here, though not more painful; and it may be said that there was not the same need for the transfer from the forecastle to the cabin; but manifestly, if upon reaching New York no relief was afforded the libelant, and he was taken back to sea at the end of his voyage, he should at least have received better treatment than to have been kept in the ship's forecastle.

"Thus far, the court has assumed that the libelant did not ask either to be discharged at New York or sent to the hospital. On these questions the evidence is conflicting. Libelant testifies one way, and the master the other. The court had not the benefit of hearing the master testify, as his evidence was taken by deposition; but it saw and observed the demeanor and conduct of the libelant on the stand, and was impressed with the truthfulness of his statement, and is therefore inclined to adopt his statement in this conflict, particularly as it is hardly possible that with an injury of this painful character he would either have wanted to be taken back to sea, or have failed to ask for all the relief and treatment which could be furnished him. The court is the more strengthened in this view from the fact that the ship's master seemed to have treated this injury as not serious; and according to libel-

ant's evidence, when at the end of 10 days he insisted on going to the hospital, the master replied that there was nothing the matter with the leg—'Get up and get to work.' Whatever may have been the view of the master as to the character of the injury, and of the doctors who were called in, it should not operate to relieve from liability in this case, in the light of the relationship existing between the ship's master and its seaman, and the degree of care due to a seaman injured in the ship's service. The captain, in his evidence, says: 'Could not see anything on his foot; but it was swelling up a little, and it was bent a little;' and the two physicians called in each testified as to its greatly swollen condition, and of their efforts to reduce the same.

"If the master and these two doctors did not know that this was a serious condition, or the doctors did not know the difference between a sprained ankle and broken ankle, certainly the consequences of such lack of information on their part ought not to be visited upon the libelant, and he denied a reasonable recovery for the suffering and additional injury he sustained as a consequence. He had no voice in the selection of doctors; was himself subject to the orders of the ship's master, and was confined on shipboard in a crippled condition, where he could secure no relief save through the ship's master; and he was not responsible in any sense for what was done; and, whatever may have been the motives of those acting, the fact is they were wrong in all they did—manifestly and patently wrong. To deny the right of recovery to the libelant would be to enable the ship's master, with a seaman having a broken ankle, to speculate on the chances of a sprained ankle, and visit the consequences of miscalculation, in addition to the suffering and affliction that ensued, upon the innocent seaman.

"In conclusion, the court thinks that an award of $500 should be made to the libelant for the additional suffering imposed upon him, and for the apparently aggravated character of the injury he sustained; the same to be paid in addition to all expenses incurred for medical treatment and cure of libelant, which in this case have been considerable, and on account of which the damages are fixed at so small an amount."

The decree complained of is without error, and is hereby affirmed.